In the Matter of **MAYER CENTRAL BUILDING CORPORATION,** Debtor.

**No. B–13806 Phx.**

United States District Court
D. Arizona.

Oct. 24, 1967.

Duecy & Moore, Charles M. Duecy, Scottsdale, Ariz., for Walter E. Fulford, trustee.

Anthony O. Jones, Phoenix, Ariz., for Mayer Central Building Corp., debtor.

Gust, Rosenfeld & Divelbess, Devens Gust, Phoenix, Ariz., for The Valley Nat. Bank of Ariz.

Evans, Kitchel & Jenckes, Edward C. LeBeau, and Stephen W. Pogson, Phoenix, Ariz., for Lawyers Title Ins. Corp., Arizona Land Title and Trust Co., and Assoc. Counsel for The Valley Nat. Bank of Ariz.

Snell & Wilmer, Frederick K. Steiner, Jr., and Thomas E. Parrish, Phoenix, Ariz., for The Marston Supply Co., Allison Steel Mfg. Co., and Federated Mortgage Investors, Inc.

Fennemore, Craig, von Ammon, McClennen & Udall, Daniel Bergin, Phoenix, Ariz., for The Prudential Ins. Co. of America.

Powers & Rehnquist, James Powers, Phoenix, Ariz., for Fifty Associates.

Allen Corotto, San Francisco, Cal., for Securities and Exchange Commission.

Tanner, Jarvis & Owens, Wallace O. Tanner, Phoenix, Ariz., for Mayer Central Bldg. Corp.

Forquer, Wolfe & Rosen, Sidney B. Wolfe), Phoenix, Ariz., for A & A Sign Co., Inc.

Engdahl, Jerman, Butler & Estep, Dean Estep, Phoenix, Ariz., for Ray Lumber Co.

Spector & Johnson, Richard E. Johnson, Phoenix, Ariz., for Pioneer Plumbing Supply Co.

Ryley, Carlock & Ralston, Frank C. Brophy, Jr., Phoenix, Ariz., for Otis Elevator Co.

Kramer, Roche, Burch, Streich & Cracchiolo, Robert E. B. Allen, Phoenix, Ariz., for Clean-Up, Inc.

Elsing & Crable, W. T. Elsing, Phoenix, Ariz., for Shaler Glass Co., Inc.

William P. Lutfy, Phoenix, Ariz., for Guy J. Qualtire dba Qualtire Plumbing Co.

Murphy, Posner & Franks, John K. Skomp, Phoenix, Ariz., for Bob Campbell Lath-Plaster-Drywall Systems, Inc.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MUECKE, District Judge.

The issues concerning the validity and priority of secured claims of creditors having heretofore come on regularly for hearing pursuant to Sections 196 and 197 of the Act of Congress Relating to Bankruptcy, interested parties having presented evidence and thereafter having briefed the matter for the Court, the Court herewith enters its findings of fact and conclusions of law.

### FINDINGS OF FACT

1. At all times material to the issues in these proceedings, the Mayer Central Building Corporation, an Arizona corporation (hereinafter referred to as "MCBC" or the debtor corporation), owned certain real property in Phoenix, Arizona, more particularly described as follows:

*PARCEL NO. 1:* Lots One (1), Three (3), Five (5), Seven (7), Nine (9), Eleven (11), Twelve (12), Thirteen (13), Fourteen (14), Fifteen (15), and Sixteen (16), Block Two (2), CATALINA PLACE, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, in Book 25 of Maps, page 24;

EXCEPT the East 26 feet of said Lot 12.

*PARCEL NO. 2:* Lots Two (2), Four (4), Six (6), Eight (8) and Ten (10), Block Two (2), CATALINA PLACE, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, in Book 25 of Maps, page 24.

*PARCEL NO. 3:* The South half of that part of Avalon Drive as shown on and dedicated by Plat of CATALINA PLACE, according to the plat of record in the office of the County

Recorder of Maricopa County, Arizona, in Book 25 of Maps, page 24 thereof, lying between the Northerly prolongations of the East and West lines of Block 2 of said CATALINA PLACE.

*PARCEL NO. 4:* That certain alley lying West of and adjoining the West line of Lot 12 in Block 2, CATALINA PLACE, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, in Book 25 of Maps, page 24 thereof, and lying between the Westerly prolongations of the North and South lines of said Lot 12.

*PARCEL NO. 5:* That certain alley lying North of and adjoining the North line of Lot 12 in Block 2, CATALINA PLACE, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, in Book 25 of Maps, page 24 thereof, and the Westerly prolongation thereof, and lying between the East line of Lot 15 in said Block 2 and the Northerly prolongation of the East line of said Lot 12;

EXCEPT the East 26 feet thereof.

*PARCEL NO. 6:* That part of the North and South alley adjoining the East line of Lots Fourteen (14) and Fifteen (15), and included between the Westerly prolongation of the North and South lines of Lot Thirteen (13), all in Block Two (2), CATALINA PLACE, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, in Book 25 of Maps, page 24.

Said property will be referred to herein as the "South property."

2. At all times material to these proceedings, Fifty Associates was the owner of the fee interest in the real property hereinafter described and until May 30, 1967, the debtor corporation had a leasehold interest in such property located in Phoenix, Maricopa County, Arizona:

*PARCEL NO. 1:* Lots Two (2) to Eighteen (18) inclusive, Block One (1), CATALINA PLACE, in the City of Phoenix, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, in Book 25 of Maps, page 24.

*PARCEL NO. 2:* All alleys in Block One (1), CATALINA PLACE, in the City of Phoenix, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, in Book 25 of Maps, page 24, lying West of the Northerly projection of the East line of Lot 2, Block 1, CATALINA PLACE;

EXCEPT THAT PART of the North half of the alley lying East of the Southerly projection of the West line of Lot 1, Block 2, in said CATALINA PLACE.

*PARCEL NO. 3:* The North half of that part of Avalon Drive dedicated on the plat of CATALINA PLACE in the City of Phoenix, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, in Book 25 of Maps, page 24.

Said property will be referred to herein as the "North property."

3. On or about April 2, 1966, by vendee's deed, the trustees herein, pursuant to an Order of this Court entered May 9, 1966, acquired the contract interest of Mayer Development Company, a partnership composed of Lawrence D. Mayer and Eric Mayer, in and to the following described property:

Lot One (1) of Block One (1), CATALINA PLACE, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, in Book 25 of Maps, page 24, together with the North half of that part of the East-West alley in said Block One lying between the Southerly prolongations of the East and West lines of said Lot One.

Said property will be referred to herein as the "Ann Clark property" since title to said property has at all times relevant to these proceedings rested in Ann Clark subject only to the contract to purchase initially held by the Mayer Development Company and subsequently conveyed as aforesaid to trustee herein by vendee's deed. Prior to April 2, 1966, the debtor corporation had no interest in the Ann

Clark property. Such property constitutes the northeast corner of the parking lot to the rear of the Mayer Central Building and at all material times it has been used by tenants of that building for parking purposes.

4. On or about the 3rd day of June, 1959, Fifty Associates as owner of the fee, entered into an agreement of lease, which appears of record in the office of the County Recorder of Maricopa County, Arizona, in Docket 2894, page 27, with the debtor corporation, Mayer Central Building Corporation, for the use and occupancy by the debtor corporation of the property referred to as the North property for a period of 99 years.

5. The debtor corporation is indebted to The Prudential Insurance Company of America as the holder of a note executed by the debtor corporation on the 20th day of November, 1962, in the unpaid principal sum of $3,277,610.24, with interest thereon from and after the 15th day of January, 1965, at the rate of eight per cent per annum, which interest at April 15, 1967, was the sum of $589,969.-84, accruing daily thereafter at the rate of $721.07 per diem, together with attorneys' fees in the sum of $45,000.00.

6. To secure the above-described note, the debtor corporation delivered to The Prudential Insurance Company of America a mortgage on the leasehold interest of the debtor corporation in the North property. Said mortgage appears of record in the office of the County Recorder of Maricopa County, Arizona, in Docket 4401 at pages 247 through 251, inclusive.

7. The payment of that note was secured by a conditional assignment of rentals executed on the 20th day of November, 1962, by the Mayer Central Building Corporation, an Arizona corporation, to The Prudential Insurance Company of America, which instrument appears of record in the office of the County Recorder of Maricopa County, State of Arizona, in Docket 4401 at pages 257 through 260, inclusive.

8. Said note was also secured by an assignment of lease agreement bearing date the 20th day of November, 1962, executed by Mayer Central Building Corporation to The Prudential Insurance Company of America, which instrument appears of record in the office of the County Recorder of Maricopa County, State of Arizona, in Docket 4401 at pages 252 through 256, inclusive.

9. Prior to January 1, 1963, a nine-story office building had been constructed on the North property, which building was known as and will be referred to herein as the Mayer Central Building.

10. Prior to August 1, 1963, T.G.K. Construction Co., Inc., an Arizona corporation (hereinafter referred to as "T. G.K."), and Mayer Central Building Corporation entered into a construction contract wherein T.G.K. agreed to construct a 25-story office building on the South property, which building came to be known and will be referred to herein as the First Federal Building.

11. T.G.K. Construction Co., Inc. commenced furnishing labor and materials pursuant to said construction contract prior to August 1, 1963.

12. Subsequent to August 1, 1962, and prior to August 1, 1963, T.G.K. entered into a contract with the debtor corporation for the construction of certain improvements located on the North property. Said improvements were characterized as the "Garage Alteration." T.G.K. and/or its subcontractors and materialmen commenced furnishing materials and performing labor prior to August 1, 1963.

13. T.G.K. and the debtor corporation entered into three contracts in January of 1964 wherein T.G.K. agreed to construct a parking garage located on the South property. Materials were first furnished and labor was first commenced pursuant to the aforesaid contracts during the month of January 1964.

14. On August 1, 1963, the Mayer Central Building Corporation and others executed their promissory note in the principal amount of $8,400,000 payable to The Valley National Bank of Arizona, a national banking association (hereinafter referred to as "Valley"). Said note was

secured by a real property mortgage recorded in the office of the Maricopa County Recorder on August 6, 1963, in Docket 4680, page 410, wherein the bank was the mortgagee; that said mortgage constituted a valid lien against the South property.

15. On or about November 25, 1964, the mortgage referred to in Finding No. 14 was satisfied of record, and Valley made a new and additional loan to the Mayer Central Building Corporation and others with a total unpaid principal balance payable in the amount of $10,052,-000.00, said loan being secured by a real property mortgage recorded in the office of the Maricopa County Recorder on November 25, 1964, in Docket 5318, page 167, wherein the bank was mortgagee, said mortgage being a valid lien against the South property.

16. The note and mortgage referred to in Finding 14 herein were evidence of and security for a certain interim construction loan, the terms of which were embodied in an agreement entered into by and between MCBC and others, wherein Valley undertook to lend the debtor corporation the total principal sum of $8,400,000.

17. Pursuant to the construction loan agreement referred to in Finding 16 herein, Valley did loan the total principal sum of $8,400,000 to the debtor corporation.

18. The note and mortgage referred to herein in Finding 15 were evidence of and security for a transaction wherein Valley agreed to lend to the debtor corporation the additional principal sum of $1,800,000 above and beyond the $8,400,-000 previously loaned, the terms of said transaction being embodied in that certain second interim loan agreement entered into by and between Valley and the debtor corporation on or about November 25, 1964.

19. The second interim loan agreement entered into by and between Valley, the debtor corporation and others, recited payment of the interim construction loan in the amount of $8,400,000.

20. The terms for repayment of the promissory notes in the principal amounts of $8,400,000 and $10,200,000, respectively, differed.

21. Valley was not repaid the principal amount of $8,400,000 or any part thereof, in cash or its equivalent, during the month of November 1964, or at any time.

22. The "Offering sheets" prepared by an officer of Valley in connection with the loan to the debtor corporation in November of 1964 and the documentation by Valley with its participating banks reflected that the transaction was an increase in an existing interim loan.

23. As of the time the second interim loan agreement, promissory note in the amount of $10,200,000, and mortgage were executed in November of 1964, construction of improvements located on the South property had been in process for some time, and Valley had knowledge of that fact.

24. The original promissory note in the amount of $8,400,000 was not returned to the Mayer Central Building Corporation or any other party when the note in the amount of $10,200,000 was executed, but was retained in Valley's files.

25. Pursuant to the terms of the second interim loan agreement, Valley did loan and advance the total additional principal sum of $1,652,000 to the debtor corporation, said sum being the entire amount Valley was obligated to advance pursuant to the terms of the second interim loan agreement.

26. On or about July 7, 1964, the debtor corporation and others executed and delivered their promissory note in the total principal amount of $500,000 to the Kirkeby-Natus Corporation.

27. Contemporaneously with the execution of the promissory note referred to in Finding 26 herein, MCBC executed and delivered to Kirkeby-Natus its mortgage wherein it mortgaged certain real property located in Maricopa and Pima Counties, Arizona, including the South property and the debtor's leasehold interest in

the North property, to Kirkeby-Natus. Said mortgage was recorded in the office of the Maricopa County Recorder on July 8, 1964, in Docket 5121, at page 42.

28. From and after July 8, 1964, the mortgage referred to in Finding 27 herein was and is a valid and existing lien against the premises described therein.

29. Contemporaneously with the execution of the note and mortgage referred to in Finding 15 herein on November 20, 1964, Kirkeby-Natus Corporation executed a subordination agreement and subordination wherein it agreed to subordinate its mortgage liens to the lien of the mortgage wherein Valley was mortgagee in the total principal amount of $10,200,-000; that the subordination was thereafter recorded in the office of the Maricopa County Recorder on November 25, 1964, in Docket 5318, page 172.

30. Federated Mortgage Investors, a New York investment trust, is the successor in interest to Kirkeby-Natus Corporation.

31. The amount due and owing to Federated Mortgage Investors was $471,-087.31 as of April 4, 1967, all of which sum is secured by the lien of its mortgage.

32. T.G.K. was the prime contractor for the major portion of the construction of the First Federal Building and for the major portion of the construction of the Parking Garage, both of said structures being situated on the South property. It had a direct contractual relationship with the debtor corporation for said construction, and it had contractual relationships with certain other companies wherein said companies performed portions of the work set forth in the T.G.K. prime contracts as subcontractors of T.G.K.

33. Among the subcontractors of T.G.K. and materialmen of subcontractors who performed labor and/or furnished materials in the construction of the First Federal Building and/or the Parking Garage, were Industrial Electric Company, Techni-Builders, Inc., J. H. Welsh & Son Contracting Co., W. A. Perry Tile & Marble Co., Raymar Contracting Corp., Nuclear Corporation of America—Valley Sheet Metal Division, Louk-Mead Plumbing and Heating Co., Southwestern Glass & Millwork Co., Acme Steel Company, Allison Steel Manufacturing Company, Ora B. Hopper & Son, Inc., and General Electric Supply Company, a division of General Electric Company.

34. The debtor corporation had direct contractual relationships with Consolidated Roofing Supply Co., Commercial Designs, Ltd., Klaas Bros., Inc., Milton J. Levkowitz dba Sun Wholesale Electric Co., and the Albert Sechrist Manufacturing Company, among others, wherein said companies and individuals undertook to furnish labor and/or materials for use in the construction of the First Federal Building and/or Parking Garage, and did furnish said labor and/or materials, as the case may be.

35. That the liens, claims of lien, secured creditors' claims, and all claims of any kind or nature asserted by Industrial Electric Company, Techni-Builders, Inc., J. H. Welsh & Son Contracting Co., W. A. Perry Tile & Marble Co., Raymar Contracting Corp., Nuclear Corporation of America—Valley Sheet Metal Division, Louk-Mead Plumbing & Heating Co., Acme Steel Company, Allison Manufacturing Company, Ora B. Hopper & Son, Inc., and General Electric Supply Company, a division of General Electric Company, Consolidated Roofing Supply Co., Commercial Designs, Ltd., Klaas Bros., Inc., Milton J. Levkowitz dba Sun Wholesale Electric Co., and the Albert Sechrist Manufacturing Company have been settled, compromised, released, withdrawn or stricken by the Court, and said parties no longer claim any lien rights and no longer assert any claim against the debtor corporation or any other party herein arising out of their participation in the construction of improvements located on the South property, and any such claims heretofore asserted by said parties, or any of them, are null and void.

36. Otis Elevator Co. (hereinafter referred to as "Otis") filed a notice and claim of mechanic's lien, said notice and

claim of lien purporting to secure the unpaid amount of $155,107.74, representing the balance due Otis for labor and/or materials furnished to the South property. That said claim of lien has been fully and completely compromised, released and settled.

37. Otis filed a notice and claim of lien on or about August 24, 1965, to secure unpaid amounts due pursuant to a direct contract with the debtor corporation for maintenance of elevators in the Mayer Central Building.

38. The notice and claim of lien filed by Otis was timely filed and thereafter Otis timely filed a pleading wherein it sought to foreclose the purported lien. The amount claimed to be secured by the remaining Otis lien is $945.43.

39. The Marston Supply Co., a partnership (hereinafter referred to as "Marston"), entered into a contractual relationship with the debtor corporation during the month of December 1965, wherein Marston agreed to and did furnish certain labor and materials to the debtor corporation, which labor and materials were furnished on both the South and North properties. The last labor performed pursuant to said contract was performed on January 25, 1965.

40. On July 7, 1966, Marston recorded a notice and claim of lien with the County Recorder of Maricopa County, Arizona, and within a reasonable time thereafter served all interested parties with copies of said notice and claim of lien, and, within six months after recording its lien, Marston thereafter filed a pleading in the Superior Court of the State of Arizona in and for the County of Maricopa in Cause No. 179138, wherein it sought to foreclose said purported mechanic's lien, and thereafter Marston filed a proof of secured claim in these proceedings, all of said documents asserting a lien for the unpaid balance due Marston of $10,626.61.

41. Marston claimed that its lien, if valid, was prior and superior to the liens of Valley and Kirkeby-Natus.

42. On or about the 30th day of January, 1967, in consideration of the sum of $1,000.00, Marston executed a subordination wherein it subordinated its lien claims, if valid, to the liens of Valley and Kirkeby-Natus. That from and after the execution of said subordination, Marston has made no claim that its lien is prior to the liens of Valley and Kirkeby-Natus.

43. The present balance due Marston is $9,626.61.

44. A & A Sign Company, Inc. (hereinafter referred to as "A & A Sign"), an Arizona corporation, had a contractual relationship with the debtor corporation wherein A & A Sign agreed to and did construct certain signs for the debtor corporation on both the North and South property. Work was performed pursuant to said contract from November 5, 1964, to and including July 2, 1965.

45. A & A Sign recorded a notice and claim of mechanic's lien on September 23, 1965, claiming a lien against both the North and South property and against the Ann Clark property, and attempted to perfect said lien in accordance with A.R.S. § 33–981 et seq.

46. A & A Sign timely filed a pleading in the Superior Court of the State of Arizona in and for the County of Maricopa in Cause No. 179138, wherein it sought to foreclose said lien in accordance with the provisions of A.R.S. § 33–998, and thereafter filed a proof of secured claim in these proceedings.

47. On or about the 2nd day of February, in consideration of the sum of $7,500.00, A & A Sign executed its partial release of lien, wholly and completely releasing the South property, Valley and Kirkeby-Natus, from any claim of lien. The present balance due A & A Sign is $13,993.38.

48. During the month of December 1963, Clean-Up, Inc., an Arizona corporation, entered into a contract with the debtor corporation wherein Clean-Up agreed to furnish certain labor and/or materials and/or services in connection with the maintenance of the Mayer Central Building.

49. On or about December 7, 1964, Clean-Up and the debtor corporation ex-

tended and amended the contract referred to in Finding 48 herein to include the furnishing of labor and/or materials and/or services in connection with the general maintenance and clean up and removal of construction wastes in the First Federal Building, and first furnished labor and/or materials pursuant to said contract on December 7, 1964.

50. The debtor corporation is indebted to Clean-Up in the total amount of $20,859.11, of which $19,561.49 is attributable to the South property, and $1,297.62 of which is attributable to the North property.

51. On or about August 25, 1965, Clean-Up recorded a notice and claim of lien in the office of the County Recorder of Maricopa County, Arizona, to secure the aforementioned amounts due and thereafter attempted to perfect said claim of lien in accordance with the provisions of A.R.S. § 33–981 et seq. Clean-Up timely filed a pleading in the Superior Court of the State of Arizona in and for the County of Maricopa in Cause No. 179138, wherein it sought to foreclose its lien in accordance with the provisions of A.R.S. § 33–998. Thereafter, Clean-Up filed its secured proof of claim in these proceedings, claiming lien rights against the North and South property.

52. The evidence in the record does not establish which portion of the sum due Clean-Up is attributable to general maintenance and janitorial services and which portion may be attributable to other services.

53. In addition to its subcontract with T.G.K., Allison Steel Manufacturing Co. (hereinafter referred to as "Allison") had a direct contract with the Mayer Central Building Corporation entered into on May 10, 1963, pursuant to which contract Allison sold and delivered structural steel for the construction of the First Federal Building, having an agreed price and reasonable value in excess of $1,117,798.84.

54. There remains due and owing to Allison on account of said contract the sum of $11,672.34.

55. The first of the materials furnished and/or labor performed by Allison in connection with its direct contract with the debtor corporation was on August 15, 1963.

56. The last labor performed by Allison pursuant to its direct contract with the debtor corporation was on September 2, 1964, at which time the contract was fully completed.

57. On April 2, 1965, Allison caused a notice and claim of mechanic's lien pertaining to its direct contract with the debtor corporation to be recorded in the office of the Maricopa County Recorder in Docket 5492 at pages 582 through 590 inclusive, and within a reasonable time thereafter served all interested parties with copies of said notice and claim of lien.

58. Within six months thereafter, Allison filed a pleading in the Superior Court of the State of Arizona in and for the County of Maricopa in Cause No. 179138 wherein it sought to foreclose said purported mechanic's lien in accordance with the provisions of A.R.S. § 33–998. On or about April 12, 1967, in consideration of the sum of $1,000.00 Allison executed an Agreement and Subordination wherein it agreed that its lien, if valid, is junior and subordinate to the lien of Valley's mortgage. The amount presently due and owing to Allison is $11,672.34.

59. On or about July 20, 1964, Ray Lumber Company (hereinafter referred to as "Ray Lumber") entered into a written contract with the debtor corporation whereby it agreed to furnish certain materials for use in the construction of the First Federal Building.

60. Pursuant to said written contract, Ray Lumber sold and delivered materials to the debtor corporation and the unpaid balance due and owing Ray Lumber pursuant to sales made under the written contract is $17,657.14.

61. As of July 15, 1965, when these reorganization proceedings were commenced, the value of material furnished by Ray Lumber for use in the First Federal Building pursuant to the written con-

tract but not then incorporated into the building was $9,687.01.

62. From and after July 15, 1965, to and including December 1, 1966, the Trustee incorporated materials furnished by Ray Lumber having a value of $7,752.-56 into the First Federal Building, and there remains on hand in storage materials having a value of $1,934.45, all of the aforesaid materials having been furnished pursuant to the written contract.

63. That the first of the materials furnished by Ray Lumber pursuant to the written contract were furnished on August 10, 1964, and the last of the materials furnished pursuant to the written contract were furnished on February 26, 1965.

64. Subsequent to the execution of the written contract referred to herein, in Finding 59, Ray Lumber and the debtor corporation entered into an oral agreement whereby Ray Lumber agreed to furnish certain materials to the debtor corporation on open account.

65. The unpaid balance due Ray Lumber for materials furnished for use in the First Federal Building pursuant to the open account is $6,384.72; the first of said materials were furnished on August 24, 1964, and the last of said materials were furnished on May 5, 1965.

66. On or about July 23, 1965, Ray Lumber caused a certain notice and claim of materialman's lien to be recorded in the office of the County Recorder of Maricopa County, Arizona, in Docket 5648, pages 176–181, inclusive.

67. Within six months of the date the notice and claim of materialman's lien was recorded by Ray Lumber, it filed a pleading in the Superior Court of the State of Arizona in and for the County of Maricopa wherein it sought to have the lien foreclosed and thereafter filed a secured proof of creditor's claim in these proceedings.

68. Ray Lumber has received no payments for materials shipped pursuant to its written contract with the debtor corporation.

69. Ray Lumber received the following payments for materials shipped pursuant to its open account: The sum of $500.00 on February 19, 1965; the sum of $1,000.00 on January 25, 1965; and the sum of $2,000.00 on December 18, 1964.

70. No officer or agent of Ray Lumber had knowledge of the fact that the mortgage from the debtor corporation to Valley in the principal amount of $8,400,-000 was satisfied of record in November of 1964, that another mortgage from the debtor corporation to Valley in the total principal amount of $10,200,000 was placed of record in November of 1964, and Ray Lumber took no action in reliance upon any of the aforesaid transactions, having no knowledge of the same until after the commencement of these reorganization proceedings.

71. Shaler Glass Co., Inc. (hereinafter referred to as "Shaler") performed work and furnished materials on both the North and South property from January 4, 1965, to and including July 2, 1965. Said labor was performed and materials furnished from January 4, 1965 to and including May 11, 1965. The unpaid balance due Shaler for labor and materials furnished on the North property is $583.-88; the unpaid balance due Shaler for labor and materials furnished on the South property is $448.44.

72. Shaler caused on August 6, 1965, to be recorded notices and claims of lien to secure the aforesaid amounts due, and timely sought foreclosure of said liens pursuant to A.R.S. § 33–998.

73. The Court has heretofore entered its order confirming a stipulation between Shaler and Valley that the mortgage lien of Valley against the premises described therein is prior and superior to the lien of Shaler, if said lien be valid.

74. Bob Campbell Lath-Plaster-Drywall Systems, Inc. (hereinafter referred to as "Campbell") furnished labor and/or materials of a reasonable value of $336.00 directly to the debtor corporation, such labor and materials having been furnished in the East Mall Buildings located on the North property. All of said labor

and materials were furnished from March 15, 1965, to and including July 13, 1965.

75. Campbell recorded a notice and claim of lien and on August 26, 1965, and thereafter timely sought foreclosure of said lien pursuant to A.R.S. § 33–998.

76. The Court has heretofore entered its Order confirming a stipulation between Campbell and Valley that the lien of Campbell, if valid, is junior and subordinate to the mortgage lien of Valley.

77. Guy J. Qualtire, dba Qualtire Plumbing Co. (hereinafter referred to as "Qualtire"), performed certain work and furnished certain materials of a total reasonable value of $945.00 as an original contract for the debtor corporation, and said sum is presently due and owing. Said work was performed in and materials furnished to the First Federal Building, and all of said materials furnished and labor performed was during the months of June and July, 1965.

78. On August 4, 1965, Qualtire filed and recorded its notice and claim of lien in the office of the County Recorder of Maricopa County, Arizona, and thereafter timely filed its pleading in Cause No. 179138 in the Superior Court of the State of Arizona in and for the County of Maricopa, wherein it sought foreclosure of its lien pursuant to A.R.S. § 33–998.

79. Pioneer Plumbing Supply Co. (hereinafter referred to as "Pioneer Plumbing") furnished materials to one Seymour Schwartz, dba Schwartz Plumbing Co., for use in the construction of the President's Health Club and Mayer Central Mall, both of said improvements being located on the North property. The last of said materials was furnished on March 2, 1965.

80. There is an unpaid balance due and owing to Pioneer Plumbing in the amount of $3,626.08, representing the reasonable value of materials furnished in connection with the construction of the aforesaid improvements.

81. Pioneer Plumbing caused a notice and claim of lien to be recorded in the office of the Maricopa County Recorder on April 1, 1965, in Docket 5491, pages 154 through 156, and thereafter Pioneer Plumbing complied with the provisions of A.R.S. § 33–998.

82. On or about August 4, 1966, the Trustee filed a petition with this Court wherein he sought approval of a sale of the South property and the improvements located thereon to Valley.

83. On or about October 14, 1966, the Court entered its Order in these proceedings directing the sale of the South property to Valley, and thereafter on or about December 1, 1966, entered its Order confirming said sale. Said orders are final and non-appealable.

84. Pursuant to the terms of the aforesaid agreement of sale, the Trustee received the sum of $700,000 in cash, a portion of which sum remains in the hands of the Trustee.

85. Prior to the enactment of certain legislation in 1966, A.R.S. § 33–993, which sets forth the procedures for perfecting mechanics' and materialmen's liens, required that a notice and claim of lien be "filed for record" in the office of the appropriate County Recorder.

86. Prior to 1966, documents could be either filed or recorded in the office of the County Recorder, or both.

87. Until July 23, 1966, the effective date of amendments to a number of applicable provisions of the Arizona Revised Statutes, it was the practice of the County Recorder's office to retain permanently on file the original instrument when the party offering it instructed that it was offered for filing, and paid the proper fee for same, which in the case of notices and claims of mechanic's or materialmen's liens was 25 cents.

88. Until July 23, 1966, it was the practice of the County Recorder's office when anyone offered a proper instrument to be recorded, and paid the proper fee therefor, which in the case of a typical one-page instrument was $1.75, to accept same for recording, to photostat same and insert the photostatic copy as a proper page in the appropriate docket book, and to return the original recorded instru-

ment by mail to the party offering it, as expeditiously as procedures would permit.

89. The practice since statehood has been to affix a rubber stamp certificate bearing the identical prefatory language ("I hereby certify that the within instrument was filed and recorded at request of * * *") to the original document being offered at the time of its offering to the person or persons manning the front counter of the Recorder's office, whether the instrument was directed to be filed or directed to be recorded. The same form language is used today by the County Recorder's office even though the statutes were amended in 1966 to eliminate altogether the filing of instruments.

90. Neither the debtor corporation nor T.G.K. nor any other person or firm was authorized to act or did act, either expressly or impliedly, as agent or contractor or in any other capacity on behalf of Fifty Associates with respect to any work performed or materials supplied either on the North property or the South property by any party to these proceedings.

91. Rents due from the debtor corporation to Fifty Associates for all periods preceding July 31, 1965, were paid in full. No part of the rents accruing subsequent to July 31, 1965, have been paid. The rent called for by the lease referred to in Finding No. 27 is the sum of $5,541.67 per month payable on the first day of each calendar month.

92. From the inception of these proceedings until May 30, 1967, the rents and other income accruing to the debtor corporation on account of its interest in the North property (the Mayer Central Building) were collected by the trustees subject to the order of this Court on sequestration dated March 16, 1966, and used by them in the operation of the debtor's business.

93. On or about January 1, 1966, Kirkeby-Natus and Fifty Associates entered into an agreement whereby Fifty Associates gave an option to Kirkeby-Natus to purchase the fee interest in the property. The option expired November 18, 1966, and was not exercised. Fifty Associates further agreed not to terminate its lease during the option period, and to assign to Kirkeby-Natus the rents coming due during the option period. In consideration, Kirkeby-Natus agreed to pay to Fifty Associates the sum of $88,-000 and such sum has been paid.

94. On or about May 17, 1967, Fifty Associates mailed to the trustees herein its notice of termination of the lease by reason of the non-payment of rent and by reason of the failure of the debtor to cause these proceedings to be dismissed within one year of their inception. On or about May 18, 1967, the trustees herein petitioned the Court for an order directing them to reject such lease. Under date of May 29, 1967, this Court entered its order terminating the lease and directing the trustees to turn over possession and control of the North property to Fifty Associates at the close of business on May 31, 1967, subject to the right of The Prudential Insurance Company. The trustees complied with such order and possession and control of the North property was accordingly turned over to Fifty Associates at the time specified.

### SUPPLEMENTAL FINDINGS OF FACT

The Court herewith enters its supplemental Findings of Fact:

95. That the claims of lien, secured creditors' claims and all claims of any kind or nature asserted by the O'Malley Lumber Co., Schwartz Plumbing Co., T. G.K. Construction Co., Inc. and the I B M Corporation have been settled, compromised, released, withdrawn or stricken by the Court, and said parties no longer claim any rights and no longer assert any claim against the debtor corporation or any other party herein, and any such claims heretofore asserted by said parties or any of them are null and void.

96. Pursuant to the Order Authorizing and Directing Trustee to Sell Certain Property Free of Liens Pursuant to Offer

of The Valley National Bank of Arizona entered herein on October 14, 1966, The Valley National Bank of Arizona, although preserving the lien of its mortgage for all other purposes, is not entitled to dividends or payments out of the estate of the debtor.

97. On July 15, 1965, and at all times thereafter, the debtor corporation is and has been insolvent, and its estate does not have sufficient assets to satisfy the claims of secured creditors in full, and has no assets available for distribution to general creditors or stockholders.

98. Heretofore there have been disbursements made out of funds subject to the claims of secured creditors for administrative expenses. If the estate hereafter acquires funds not subject to the claims of secured creditors, it is obligated to repay the amounts heretofore disbursed from encumbered funds.

## CONCLUSIONS OF LAW

1. The proofs of claim filed herein by Allison Steel Manufacturing Co., Ray Lumber Company, Pioneer Plumbing Supply Co., Clean-Up, Inc., Bob Campbell Lath-Plaster-Drywall Systems, Inc. A & A Sign Co., Guy J. Qualtire dba Qualtire Plumbing Co., Otis Elevator Co., Shaler Glass Co., Marston Supply Co. Kirkeby-Natus Corporation. The Prudential Insurance Company of America, Fifty Associates, and The Valley National Bank of Arizona were filed in the manner and within the time prescribed by the Court.

2. Arizona Land Title and Trust Company, Lawyers Title Insurance Corporation and The Valley National Bank of Arizona, parties in interest herein, timely filed objections to the allowance of the claims of A & A Sign Co., Allison Steel Manufacturing Co., Ray Lumber Company, Pioneer Plumbing Supply Co., Clean-Up, Inc., Bob Campbell Lath-Plaster-Drywall Systems, Inc., Guy J. Qualtire dba Qualtire Plumbing Co., Otis Elevator Co., Shaler Glass Co. and Marston Supply Co., the remaining claims of

all such parties being based upon direct contracts with the debtor corporation.

3. No party in interest herein filed objections to the allowance of the claims of The Valley National Bank of Arizona, The Prudential Insurance Company of America, Kirkeby-Natus Corporation or Fifty Associates, within the time prescribed by the Court.

4. The Court has heretofore entered its orders determining the value of property and interests in property owned by the debtor corporation which is or may be subject to liens of secured creditors.

5. Pursuant to §§ 196 and 197 of the Act of Congress Relating to Bankruptcy, hearings were held at which time evidence concerning the validity, amounts and priority of various secured claims was presented to the Court.

6. All parties in interest had an opportunity to present such evidence as they deemed material to the issues to be decided by the Court.

7. The Court has exclusive jurisdiction to determine the validity and priority of all claims against the debtor corporation, including the secured claims asserted herein by Allison Steel Manufacturing Co., Ray Lumber Company, Pioneer Plumbing Supply Co., Clean-Up, Inc., Bob Campbell Lath-Plaster-Drywall Systems, Inc., Guy J. Qualtire dba Qualtire Plumbing Co., Otis Elevator Co., Shaler Glass Co., Marston Supply Co., Kirkeby-Natus Corporation, The Prudential Insurance Company of America, Fifty Associates, and The Valley National Bank of Arizona.

8. Pursuant to the Order Authorizing and Directing Trustee to Sell Certain Property Free of Lien Pursuant to Offer of The Valley National Bank of Arizona entered on October 14, 1966, and the Commitment to Pay Liens attached thereto, The Valley National Bank of Arizona is obligated to discharge all mechanics' and materialmen's liens against the South property which are valid, prior and superior to the lien of the

mortgage of The Valley National Bank of Arizona.

9. The proceeds of the sale of the South property are impressed with such valid liens against such property as are junior to the mortgage of Valley, in order of priority.

10. Valid mechanics' and materialmen's liens attach only upon the lot or lots upon which are situated the structures on which the claimant performed labor and/or furnished materials.

11. The priority date of the mortgage lien of The Valley National Bank of Arizona is November 25, 1964.

12. The mechanics' lien priority date of the various direct or original contractors is the date upon which each such contractor first performed labor or furnished materials.

13. In order to perfect a valid mechanic's or materialman's lien under a given contract, a direct or original contractor must file or record his notice and claim of lien within ninety (90) days from the last date upon which such contractor performed labor or furnished materials under said contract.

14. Recording rather than filing of a notice and claim of lien constituted compliance with A.R.S. § 33–993 during the year 1965.

15. The liens of Otis Elevator Company, A & A Sign Company, Bob Campbell Lath-Plaster-Drywall Systems, Inc., and Pioneer Plumbing Supply Company, to the extent valid, attach only to the debtor corporation's interest in the North property, which has heretofore been determined to be valueless. The Court has heretofore determined that all of said claims are junior and subordinate to the claims and interests of Prudential and Fifty Associates.

16. The liens of Otis Elevator Company, A & A Sign Company, Bob Campbell Lath-Plaster-Drywall Systems, Inc. and Pioneer Plumbing Supply Company, even if valid, exceed the value of their security in the amounts claimed, and each such claim should be reclassified as unsecured in its entirety.

17. The claims of all remaining lien claimants attributable to the South property are subordinate to the claim of Federated Mortgage Investors, Inc.

18. The claim of Federated Mortgage Investors, Inc. exceeds the remaining proceeds of the sale of the South property and all other funds attributable to said property.

19. The secured claims of Clean-Up, Inc., Guy J. Qualtire dba Qualtire Plumbing Co., Shaler Glass Co., and Marston Supply Co., even if otherwise valid, to the extent attributable to the South property, exceed the value of their security and should be reclassified as unsecured.

20. The lien claim of Ray Lumber Company, to the extent valid, is prior to the mortgage lien of The Valley National Bank of Arizona.

21. The portion of the lien claim of Ray Lumber Company attributable to materials furnished pursuant to its written contract is invalid for failure to perfect lien rights within the time prescribed by law.

22. The lien claim of Allison Steel Manufacturing Co. is invalid for failure to perfect lien rights within the time prescribed by law.

23. The portion of the lien claim of Ray Lumber Company attributable to materials furnished pursuant to its open account is valid.

24. Clean-Up, Inc. has not proven its claim for items which are lienable under A.R.S. § 33–991.

25. The claims of lien claimants whose claims are attributable to the South property, except Ray Lumber Company, are subordinate and inferior to the lien of The Valley National Bank of Arizona, even if valid.

26. The lien of Federated Mortgage Investors, Inc. is subordinate to the lien

of The Valley National Bank of Arizona by virtue of the subordination agreement entered into between those parties.

27. Pursuant to its Commitment to Pay Liens, The Valley National Bank of Arizona is obligated to pay to Walter E. Fulford, Trustee, for the benefit of Ray Lumber Company, the sum of $6,384.72, at such time as the Court's adjudication becomes final and non-appealable.

28. Except for the aforesaid obligation for the benefit of Ray Lumber Company, The Valley National Bank of Arizona has no obligation pursuant to its Commitment to Pay Liens.

29. The lien of the mortgage of The Prudential Insurance Company of America on the North property was a valid, first and prior lien on the leasehold interest of the debtor corporation, prior to the interests, claims, or liens of all other mortgagees or lien claimants, in and to the debtor's interest in the North property.

30. The Conditional Assignment of Rentals and the Assignment of Lease Agreement executed by the Mayer Central Building Corporation to The Prudential Insurance Company of America are valid and existing assignments of the debtor corporation's interest in the property described within said assignments, and are prior to the claims of all other mortgagees, claimants of lien and unsecured creditors.

31. Fifty Associates is the owner in fee of the North property, subject to the rights of The Prudential Insurance Company of America, if any, but subject to no other lien or encumbrance by any other party to these proceedings.

32. The trustees herein, on behalf of the debtor corporation, are the owners of the vendee's interest in the Ann Clark property subject to no lien or encumbrance by any party to these proceedings.

33. That an order be entered accordingly.